

**SO ORDERED.**

**SIGNED this 18 day of January, 2013.**

_Stephani W. Humrickhouse_
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                                        CASE NO.

**BRIER CREEK CORPORATE CENTER**              **12-01855-8-SWH**
**ASSOCIATES LIMITED PARTNERSHIP,** *et al.*,

      **DEBTORS**

### ORDER REGARDING DEBTORS' LIMITED
### OBJECTIONS TO CLAIMS OF BANK OF AMERICA, N.A.

The matters before the court are the debtors' limited objections to the claims filed by Bank

of America, N.A (the "Limited Objections").  A hearing was conducted in Raleigh, North Carolina,

on December 12, 2012.

On October 13, 2011, the debtors[1] and other affiliated entities[2] (the "Plaintiffs) filed a complaint in state court alleging fifteen claims for relief against Bank of America, N.A. ("Bank of America") relating to certain loans made by Bank of America to the debtors.  On January 13, 2012, Bank of America responded to the complaint by denying liability as to all fifteen claims and asserting counterclaims against the Plaintiffs.

On March 9, 2012, the debtors filed for relief under Chapter 11 of the Bankruptcy Code.  On March 21, 2012, Bank of America filed proofs of claim against all debtors.[3]  On March 23, 2012, the court entered an order consolidating the debtors' cases for procedural purposes only and authorizing joint administration.  On May 7, 2012, the Plaintiffs removed the state court case to the United States Bankruptcy Court for the Western District of North Carolina.  By an order entered on June 18, 2012, the case was transferred to this court resulting in the initiation of an adversary proceeding on June 19, 2012 (No. 12-00121-8-SWH) (the "Adversary Proceeding").

---

[1] The debtors are: Brier Creek Corporate Center Associates Limited Partnership ("Brier Creek Corporate Center"), Brier Creek Office #4 LLC ("Brier Creek Office #4"), Brier Creek Office #6, LLC ("Brier Creek Office #6"), Service Retail at Brier Creek, LLC ("Service Retail at Brier Creek"), Service Retail at Whitehall II Limited Partnership ("Service Retail at Whitehall"), Shopton Ridge 30-C, LLC ("Shopton Ridge"), Whitehall Corporate Center #4, LLC ("Whitehall Corporate Center #4"), Whitehall Corporate Center #5, LLC ("Whitehall Corporate Center #5"), and Whitehall Corporate Center #6 ("Whitehall Corporate Center #6").

[2] The other affiliated entities are Cary Creek Limited Partnership; Shopton Ridge Business Park Limited Partnership; AAC Retail Property Development and Acquisition Fund, LLC; American Asset Corporation Companies Limited; and American Asset Corporation.  Cary Creek Limited Partnership filed a voluntary petition on January 3, 2013, and its case was consolidated with the debtors' cases, for procedural purposes only, by Order dated January 10, 2013.

[3] Brier Creek Corporate Center Claim No. 2; Brier Creek Office #4 Claim No. 1; Brier Creek Office #6 Claim No. 1; Service Retail at Brier Creek Claim No. 1; Service Retail at Whitehall Claim No. 1; Shopton Ridge Claim No. 1; Whitehall Corporate Center #4 Claim No. 1; Whitehall Corporate Center #5 Claim No. 1; Whitehall Corporate Center #6 Claim No. 1.

On September 7, 2012, the debtors filed the instant Limited Objections. Debtors assert that there are some aspects of Bank of America's claims that must be determined to allow formulation of a plan and disclosure statement, thus necessitating the Limited Objections. The debtors request a court determination as to the following five components of Bank of America's claims: (1) principal; (2) interest; (3) attorneys' fees; (4) expenses charged to the debtors, other than attorneys' fees; and finally, (5) late fees. A specific determination of all of these components, except the principal amount, is dependent upon a resolution of both the existence and timing of default. That resolution will not be made in this order, but in the Adversary Proceeding.

## I.      Outstanding Principal

The debtors do not dispute the amount of outstanding principal balance owed to Bank of America as set forth in the bank's proofs of claim, although they did request an order setting out what those amounts are. Accordingly, the outstanding principal balance owed by each debtor to Bank of America as of the petition date is as follows: Brier Creek Corporate Center–$9,704,729.51; Brier Creek Office #4–$15,374,523.03; Brier Creek Office #6–$16,229,863.65; Service Retail at Brier Creek–$4,754,049.10; Service Retail at Whitehall–$1,863,102.15; Shopton Ridge–$4,937,596.22; Whitehall Corporate Center #4– $23,403,777.29; Whitehall Corporate Center #5–$14,778,393.81; Whitehall Corporate Center #6– $14,206,780.21.

## II.     Interest

The dispute over the interest component in Bank of America's claims relates to whether the interest should have been calculated at the contract or default rate. Resolution of this issue necessarily depends on the outcome of the Adversary Proceeding where the existence and timing of default will be determined. The court, therefore, will not decide which rate is appropriate in this

order.  But since the debtors do not dispute Bank of America's computation of interest at the

contract rate, if the contract rate is to be applied, the court finds that amount as of the petition date

to be  $5,096,214.39.  Likewise, the debtors  do not dispute Bank of America's computation of

interest at the default rate through September 2, 2011, and the court therefore finds that if the default

rate is appropriate, that interest component through September 2, 2011, is $6,327,037.99.

## III.    Attorneys' Fees

The debtors also object to Bank of America's claims to the extent that they each include

attorneys' fees in the amount of 15% of the outstanding balance of the indebtedness at the time of

the alleged default.  The operative promissory notes executed by Brier Creek Office IV, Brier Creek

Office VI, Service Retail at Whitehall, Whitehall Corporate Center IV, Whitehall Corporate Center

V, and Whitehall Corporate Center VI contain the following provision regarding attorneys' fees:

> Costs and Expenses of Enforcement.  Borrower agrees to pay Lender on demand all
> costs and expenses incurred by Lender in seeking to collect this Note or to enforce
> any of Lender's rights and remedies under the Loan Documents, including court
> costs, reasonable attorneys' fees (as determined in accordance with Section 8.19 of
> the Loan Agreement) and expenses, whether or not suit is filed hereon, or whether
> in connection with bankruptcy, insolvency or appeal.

The "Loan Agreement" referenced within this section is defined in each of these notes to include,

among other documents, a Construction Loan Agreement.  Section 8.19 of the Construction Loan

Agreement is titled "Attorneys' Fees" and includes the following language:

> Any provisions of the Loan Documents providing for the payment of "attorneys'
> fees", "reasonable attorneys' fees" or other words or phrases of similar import, shall
> mean attorneys' and paralegals' fees incurred based upon the usual and customary
> hourly rates of the attorneys and paralegals involved for time actually spent by such
> attorneys and paralegals and without giving effect to any statutory presumption that
> may then be in effect (including, without limitation, that under N.C. Gen. Stat. § 6-
> 21.2).

The operative promissory notes executed by Brier Creek Corporate Center Associates, Service Retail at Brier Creek, and Shopton Ridge contain the following provision regarding attorneys' fees:

> If any holder of this Note retains an attorney in connection with any Default or at maturity or to collect, enforce or defend this Note or any other Loan Document in any lawsuit or in any probate, reorganization, bankruptcy, arbitration or other proceeding, or if Borrower sues any holder in connection with this Note or any other Loan Document and does not prevail, then Borrower agrees to pay to each such holder, in addition to principal, interest and any other sums owing to Lender hereunder and under the other Loan Documents, all costs and expenses incurred by such holder in trying to collect this Note or in any such suit or proceeding, including, without limitation, reasonable attorneys' fees and expenses, investigation costs and all court costs, whether or not suit is filed hereon, whether before or after the Maturity Date, or whether in connection with bankruptcy, insolvency or appeal, or whether collection is made against Borrower or any guarantor or endorser or any other person primarily or secondarily liable hereunder.

These notes do not contain a parenthetical specifically referencing a section of the Note or other Loan Document defining "attorneys' fees" or "reasonable attorneys' fees." However, they each identify the terms "Loan Document" and "Loan Documents" to include an Acquisition and Site Work Improvement Loan Agreement. The Acquisition and Site Work Improvement Loan Agreement contains a definition of the terms "attorneys' fees" and "reasonable attorneys' fees" that is identical to the definition contained in Section 8.19 of the Construction Loan Agreement. The Acquisition and Site Work Improvement Agreement states that this definition shall apply to "[a]ny provisions of the Loan Documents providing for the payment of 'attorneys' fees' and 'reasonable attorneys' fees' or other words or phrases of similar import."

Therefore each and every note executed by the respective debtors includes a definition of "attorneys' fees" and "reasonable attorneys' fees," either through incorporation of the accompanying Construction Loan Agreement or Acquisition and Site Work Improvement Loan Agreement.

5

Relying on these documents, the debtors argue that the attorneys' fees to which Bank of America is entitled, if any,[4] are limited to those actually incurred by the bank, an amount significantly lower than 15% of the outstanding balance.[5]   Bank of America contends that because the relevant provisions of the loan agreement do not specify a specific percentage for the recovery of attorneys' fees, N.C. Gen. Stat. § 6-21.2(2) applies entitling the bank to 15% of the "outstanding balance" owing on the notes at the time of the alleged default, regardless of the amount of attorneys' fees actually incurred.

In North Carolina, attorneys' fees are ordinarily "not recoverable either as an item of damages or of costs, absent express statutory authority for fixing and awarding them." Bombardier Capital, Inc. v. Lake Hickory Watercraft, Inc., 178 N.C. App. 535, 540-41, 632 S.E.2d 192, 196 (2006).  However, "obligations to pay attorneys' fees upon any note" are valid and enforceable pursuant to N.C. Gen. Stat. § 6-21.2, subject to the following provisions, among others:

> (1)  If such note . . . provides for attorneys' fees in some specific percentage of the "outstanding balance" as herein defined, such provision and obligation shall be valid and enforceable up to but not in excess of fifteen percent (15%) of said "outstanding balance" owing on said note . . . .
>
> (2)  If such note . . . provides for the payment of reasonable attorneys' fees by the debtor, without specifying any specific percentage, such provision shall be construed to mean fifteen percent (15%) of the "outstanding balance" owing on said note.

Some courts strictly interpreting the language of N.C. Gen. Stat. § 6-21.2 find that provisions addressing attorneys' fees fall within one of two categories–those that specify a percentage and those

---

[4]The debtors argue that Bank of America is not entitled to any attorneys' fees if the Adversary Proceeding determines that they were not in default.

[5]The difference between the fees actually incurred and those fees calculated at 15% of the outstanding balance is over $16,000,000.   The 15% figure may change slightly depending on the outcome of the Adversary Proceeding, but the difference between it and actual fees will remain substantial.

that do not.  The former category is governed by subsection (1) of N.C. Gen. Stat. § 6-21.2, which authorizes the application of the parties' contractually agreed upon percentage.  The latter category is governed by subsection (2) of N.C. Gen. Stat. § 6-21.2, which, according to some courts, dictates 15% as the applicable percentage.  Compare Coastal Prod. Credit Ass'n v. Goodson Farms, Inc. 70 N.C. App. 221, 225, 319 S.E.2d 650, 654 (1984) (holding that the language "not less than ten per centum" does in fact specify "some specific percentage" and is thus controlled by subsection (1)), and West End III Ltd. Partners v. Lamb, 102 N.C. App. 458, 402 S.E.2d 472, disc. rev. denied, 329 N.C. 506, 407 S.E.2d 857 (1991) (following the court's holding in Coastal), with  RC Assocs. v. Regency Ventures, Inc., 111 N.C. App. 367, 372, 432 S.E.2d 394, 397 (1993) ("Because the lease provides for reasonable attorney's fees and does not refer to any specific percentage, N.C.G.S. § 6-21.2(2) applies."), and Trull v. Cent. Carolina Bank & Trust, 124 N.C. App. 486, 490, 478 S.E.2d 39, 42 (1996) ("Because the note provides for 'reasonable attorneys' fees' without referring to any specific percentage of fees to be paid, N.C.G.S. 6-21.2(2) applies."), and In re Pak-a-Sak Food Stores, Inc., 2008 Bankr. LEXIS 4390, at *10 (Bankr. E.D.N.C. Jan. 9, 2008) ("The obligations each call for SummitBridge [the creditor] to collect from the debtor 'reasonable' attorneys' fees and costs, rather than specifying a percentage of the outstanding balance to be collected as attorneys' fees. Therefore, the provisions of § 6-21.2(2), rather than § 6-21.2(1), apply.").

There is at least one North Carolina state court decision, however, that has addressed language providing for attorneys' fees that did not fit so neatly within either subsection (1) or subsection (2) of N.C. Gen. Stat. § 6-21.2.  See Barker v. Agee, 93 N.C. App. 537, 378 S.E.2d 566 (1989), aff'd in part, rev'd in part (on other grounds), 326 N.C. 470, 389 S.E.2d 803 (1990) (interpreting a note providing for reasonable fees "but not more than such attorneys' usual hourly

charges for the time actually expended"); see also West End III Ltd. Partners, 102 N.C. App. at 461, 402 S.E.2d at 475 (explaining the court's holding in Barker and analogizing language allowing for fees of "not less than ten per centum" to the language used in the note at issue in Barker).  As far as the court is aware, Barker is the only reported decision in North Carolina to interpret language which limits attorney's fees to those actually incurred without specifying a percentage that would constitute a reasonable fees.[6]

Therefore, courts addressing attorneys' fees, and the proper application of subsections (1) and (2) of N.C. Gen. Stat. § 6-21.2, have interpreted language that falls within one of three categories: (1) provisions that provide for the calculation of fees based on a fixed, minimum or maximum percentage of the outstanding balance; (2) provisions that allow for "reasonable attorneys' fees" without indicating in any way how the amount should be calculated; and finally, (3) provisions that express the parties' intent as to the method for calculating fees but do not specify any percentage.  The difficulty is in determining whether this last category falls within the scope of subsection (1) or subsection (2) of N.C. Gen. Stat. § 6-21.2.

In discussing the circumstances in which subsection (2) applies, the North Carolina Court of Appeals in Coastal Prod. Credit Ass'n v. Goodson Farms, Inc. stated the following:

> The quoted statutory language does not require specification of an exact or fixed percentage, or override minimum or maximum percentages: it becomes operative only on failure to specify *any* percentage.  The General Assembly apparently intended G.S. 6-21.2(2) as a fall-back only in case the agreement contained nothing

---

[6]The Barker decision was reversed in part and affirmed in part by the North Carolina Supreme Court.  Barker v. Agee, 326 N.C. 470, 389 S.E.2d 803 (1990).  The reversal pertained to whether a third-party defendant had standing to appeal the judgment entered by the trial court.  Id. at 471-72, 289 S.E.2d at 804-05.  However, the Court of Appeals' conclusion to affirm the entry of summary judgment in favor of the plaintiffs on the promissory note, which included the issue over attorneys' fees, was affirmed.  Id. at 472-73, 289 S.E.2d at 805.

regarding the parties' intent as to what constituted a reasonable percentage. It apparently did not intend it as a means of legislating a total end to hearings on attorneys' fees.

70 N.C. App. 221, 225, 319 S.E.2d 650, 654 (1984) (citations omitted).

A strict reading of this explanation suggests that parties intending to avoid the application of subsection (2) must specify some percentage, whether it be a fixed, minimum or maximum, of the outstanding balance for the calculation of reasonably attorneys' fees. Yet by referring to subsection (2) as a "fall-back only" statute, the Court of Appeals arguably implied that this subsection should not trump the clear intent of the parties as reflected in the agreement, regardless of whether the parties opted to include a specific percentage. The issue presented in the instant case is that, while the parties' intent is clearly expressed in the loan agreement, the agreement fails to specify any *percentage* that would constitute "reasonable" attorneys' fees. Is the court, therefore, to apply subsection (2) so that Bank of America recovers fees in the amount of 15% of the outstanding balance when the parties unambiguously intended to calculate such fees on a different basis? This not only contradicts traditional notions of contract interpretation and enforcement,[7] it is inconsistent with the interpretation of subsection (2) as a "fall-back only" statute.

Although the court in Coastal Production seemed to limit the application of subsection (1) to agreements specifying a percentage, subsequent decisions clarify that it is properly applied when there are other indicia of the parties' intent as to how fees should be calculated, even if those agreements do not provide a specific percentage. Barker, 93 N.C. App. 537, 378 S.E.2d 566;

_____

[7]See State v. Philip Morris USA Inc., 363 N.C. 623, 632, 685 S.E.2d 85, 91 (2009) ("[W]hen the terms of a contract 'are plain and unambiguous, there is no room for construction. The contract is to be interpreted as written' . . . and 'enforce[d] . . . as the parties have made it[.]'" (quoting Jones v. Casstevens, 222 N.C. 411, 413, 23 S.E.2d 303, 305 (1942); Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970)).

West End III Ltd. Partners v. Lamb, 102 N.C. App. 458, 402 S.E.2d 472, disc. rev. denied, 329 N.C. 506, 407 S.E.2d 857 (1991).  In Barker, the note provided for reasonable attorneys' fees "but not more than such attorneys' usual hourly charges for the time actually expended."  93 N.C. App. at 544, 378 S.E.2d at 570.  In citing to subsection (1) of N.C. Gen. Stat. § 6-21.2, the court stated that the language used in the note "would have permitted the trial court to award up to fifteen percent of the balance due on the note."  Id.  The court then affirmed the trial court's award of attorneys' fees in an amount that "was far less than fifteen percent of the balance due," stating that the evidence and findings of fact were sufficient to support the amount of the award.  Id.

The court in West End III Ltd. Partners explained its holding in Barker, and in doing so it reaffirmed that agreements using language to limit attorneys' fees similar to the language used in Barker are governed by subsection (1).  102 N.C. App. at 461, 402 S.E.2d at 475.  In West End III Ltd. Partners, the note provided for "reasonable attorneys' fees not exceeding a sum equal to fifteen percent (15%) of the outstanding balance."  102 N.C. App. at 459, 402 S.E.2d at 473.  Based on this provision, the trial court awarded "payment of attorney's fees of 15% without determining whether that amount was reasonable."  Id. at 460, 402 S.E.2d at 474.  The Court of Appeals reversed and remanded the case back to the trial court, holding that the trial court was *required* to make "findings as to the amount of time defendants' attorney actually spent attempting to collect the debt, the attorney's hourly rates, or the reasonable amount of time required to collect a debt such as the one owed by plaintiffs."  Id. at 461, 402 S.E.2d at 475.  The court cited to Barker for the requirement that the award of attorneys' fees based on provisions like in Barker must be supported by "sufficient evidence."  Id.  The decision in West End III Ltd. Partners can thus be construed as at least an implicit acknowledgment by the Court of Appeals that the language used in Barker to limit

10

attorneys' fees is to be treated in the same way as the language used in <u>West End III Ltd. Partners</u>, with both being governed by subsection (1) and both requiring trial court's to make findings of fact to support the reasonableness of an award of fees.

There are several reasons why language similar to that used in <u>Barker</u> should be considered comparable to language providing a specific percentage for calculating fees, thus both being subject to subsection (1). First, enforcing the parties' agreement to limit attorneys' fees to those actually incurred, instead of invoking subsection (2) to potentially create a windfall, conforms to the traditional notions of contract interpretation and enforcement. Second, it follows the court's interpretation of subsection (2) as a "fall-back only" statute, as stated in <u>Coastal Production</u>. Third, and finally, there may be instances when the borrower, or possibly the lender, does not want to calculate attorneys' fees on a percentage basis in acknowledgment of the fact that any percentage agreed upon would greatly exceed the actual amount of fees incurred. Take, for example, the instant case where there exists a significant amount of principal, and 15% of the outstanding loan balance exceeds the amount of fees actually incurred by approximately $16,000,000.00.

Based on the foregoing analysis, the court concludes that the notes at issue in the instant case are governed by subsection (1) of N.C. Gen. Stat. § 6-21.2. Similar to the note in <u>Barker</u>, the language used in these notes limits attorneys' fees to those "incurred based upon the usual and customary hourly rates of the attorneys and paralegals involved for time actually spent by such attorneys and paralegals." In fact, the notes go even further by expressing the parties intent to avoid any "statutory presumption" that may be in effect, "including, without limitation, that under N.C. Gen. Stat. § 6-21.2." Finding that the attorneys' fees are not limited to those actually incurred, as expressly called for in the loan agreement, simply because the parties did not specify an exact

percentage in effect would be using N.C. Gen. Stat. § 6-21.2(2) as a "means of legislating a total end to hearings on attorneys' fees." Subsection (2) should instead be applied in a manner consistent with its interpretation as a "fall-back only" statute, i.e., to be used only where there is no other indication of intent, and the notes at issue in this case should be construed in manner consistent with the decisions in Barker and West End III Ltd. Partners. In doing so, resort to subsection (2) in the instant case is unnecessary because the notes unequivocally express the parties' intent to limit attorneys' fees to those actually incurred.

Assuming, *arguendo*, that subsection (2) of N.C. Gen. Stat. § 6-21.2 applies to the notes in the instant case, recent cases suggest that strict application of the 15% calculation is not proper. See Silverdeer St. John Equity Partners I LLC v. Kopelman, 2012 U.S. Dist. LEXIS 136287, at *11-21 (E.D.N.C. Sept. 24, 2012) (acknowledging that subdivision (2) applied but requiring the plaintiff to submit an affidavit with the "time/billing records associated with the requested fees and costs" in order to determine the appropriate amount of the fee award); see also Telerent Leasing Corp. v. Boaziz, 200 N.C. App. 761, 766-67, 686 S.E.2d 520, 523-24 (2009) (interpreting subdivision (2) as a "statutory ceiling of fifteen percent" and affirming trial court's award of attorneys' fees in an amount less than  15% of the outstanding balance); Bombardier Capital, Inc. v. Lake Hickory Watercraft, Inc., 178 N.C. App. 535, 541, 632 S.E.2d 192, 197 (2006) (applying subdivision (2) to a contract that provided for "reasonable attorneys fees" but affirming trial court's award of fees in an amount less than the 15% of the outstanding balance).

During the hearing, Bank of America submitted evidence that it was charged $243,013.80 in pre-petition attorneys' fees and expenses by Ellis & Winters, LLP. The debtors do not dispute the reasonableness of these fees. Bank of America omitted, however, the amount of fees and costs

charged by Troutman Sanders, LLP, its non-bankruptcy counsel.  The court allowed Bank of America to supplement the record with evidence of such fees.  On December 17, 2012, Bank of America filed its supplement to the record including billing invoices indicating that Troutman Sanders had charged $79,360.47 in pre-petition fees and costs.  On December 26, 2012, the debtors also supplemented the record to state they did not dispute the reasonableness of either the Troutman Sanders or Ellis & Winters fee.    The debtors did, however, assert the following objection in their supplement:

> The Debtors also do not dispute the reasonableness of the hourly fees and expenses of Ellis & Winters; however, approximately $50,909.87 of these fees and expenses were incurred prior to September of 2011.  If the Court determines that a default existed as of September 1, 2011 and that BOA is entitled to recover default-rate interest and actual attorneys' fees from and after that date, BOA would not be entitled to recover the fees and expenses of Ellis & Winters incurred prior to September 1, 2012 under the relevant loan documents.

The court concludes that the fees of Ellis & Winters and Troutman Sanders actually incurred by Bank of America are reasonable and below the maximum imposed by N.C. Gen. Stat. § 6-21.2(1).  As discussed above, the court will not apply subsection (2) of § 6-21.2, but will base its award of attorneys' fees on actual fees incurred.  However, a determination of the specific amount of the attorneys' fees component of Bank of America's claims, if any, will be deferred until the existence and date of default is decided in the Adversary Proceeding.

## IV.    Late Fees

Brier Creek Corporate Center objects to the calculation of a late fee assessed against it by Bank of America for a payment due on March 31, 2011.[8]  The operative provisions of the note

---

[8]The debtors also argue that Bank of America may not be entitled to any of the late fees assessed, except for one fee charged against Brier Creek Corporate Center in the amount of $40,000, if the debtors are found not to have been in default.  This issue depends on the outcome of the

executed by Brier Creek Corporate Center with respect to payments and late fees state in pertinent part:

> Principal Payments.  In addition to the other payments required herein, the Borrower shall make the following principal payments against the outstanding principal balance of this Note: (A) on or prior to March 31, 2010, principal payments in an amount equal to . . . (1) an aggregate amount of $1,000,000.00 (counting principal payments made pursuant to subsection (1)(a)(i) above) . . . and (B) on or prior to March 31, 2011, principal payments in an amount equal to . . . (1) an aggregate amount of $2,500,000.00 (counting principal payments made pursuant to subsection (1)(a)(i) and item (A) above . . . .

> \*    \*    \*

> Late Charges.  If Borrower shall fail to make any payment under the terms of this Note within fifteen (15) days after the date such payment is due, Borrower shall pay to Lender on demand a late charge equal to four percent (4%) of the amount of such payment, unless waived in Lender's sole discretion.

Brier Creek Corporate Center failed to make the $1,000,000 payment on or within fifteen days after March 31, 2010 to Bank of America as required by the note.  Bank of America assessed a fee against the debtor for $40,000 pursuant to the note's late charge provision.  On March 31, 2011, the debtor again failed to make the payments as required by the terms of the note.  Bank of America then assessed a fee against the debtor for $100,000, or 4% of the $2,500,000 that became due on March 31, 2011.

The debtor argues that the fee of $100,000 assessed for the missed payment due on March 31, 2011 amounted to double-charging.  Specifically, the debtor contends that this $100,000 fee included the $40,000 late charge fee previously assessed against the debtor for the missed payment due on March 31, 2010.  According to the debtor, the fee assessed for the March 31, 2010 missed

Adversary Proceeding and will not be addressed in this order.

payment should have been deducted from the $100,000 fee assessed for the March 31, 2011 missed payment, which would have reduced the latter charge to $60,000.

Bank of America responds by arguing that it properly calculated the late charge fees in accordance with the terms of the note.  The note provides that failure to make the payment within the time specified requires the debtors to pay a late charge equal to 4% of "the amount of such payment."  Bank of America notes that there is no language within the late charge provision that allows a credit for previously assessed missed payment late charges.  Therefore, the "amount of such payment" due on March 31, 2011 was $2,500,000, and since the debtors failed to pay it within the required time period, Bank of America was entitled to assess a late fee for 4% of that amount, i.e. $100,000.

The court agrees with Bank of America's interpretation of the provisions governing the assessment of late charges.   A plain reading of such provisions permits the method of calculation used by the bank.  The debtors were required to make a payment of $2,500,000 on or within fifteen days of March 31, 2011.  The debtors failed to timely make that payment.  In clear language, the notes entitle Bank of America to assess a late charge equal to 4% of the $2,500,000 the debtors were required to pay.

The notes permitted the debtors to reduce the amount of the payment that was due on March 31, 2011, by any previously made payments.  However, the notes did not provide for the reduction of the amount of late fees by the amount of any previously assessed late fees.  Therefore, Bank of America was entitled to assess a late charge in the amount of $100,000 for the payment due on or within fifteen days of March 31, 2011, if the existence and timing of default is established in the Adversary Proceeding.

15

## V.    Expenses Other Than Attorneys' Fees

Finally, the debtors' argue that, depending on the outcome of the Adversary Proceeding, Bank of America may not be entitled to certain expenses associated with appraisals obtained by the bank prior to the petition date.  The Construction Loan Agreement and the Acquisition and Site Work Improvement Loan Agreement each contain a provision addressing the costs related to such appraisals.  This provision states:

> Lender may obtain from time to time, an appraisal of all or any part of the Property prepared in accordance with written instructions from Lender by a third-party appraiser engaged directly by Lender.  Each such appraiser and appraisal shall be satisfactory to Lender (including satisfaction of applicable regulatory requirements). The cost of any such appraisal shall be borne by Borrower so long as (a) such appraisal is the first appraisal in any three (3) year period, (b) such appraisal is obtained after the occurrence of a Default[9] or (c) such appraisal is obtained in connection with an extension,[10] amendment, modification, supplement to or restatement of this Agreement or any Loan Document.  Such cost shall be due and payable by Borrower on demand and shall be secured by the Loan Documents.[11] The cost of additional appraisals obtained by Lender with respect to the Property shall be borne by Lender.

Relying on this provision, the debtors point to approximately thirty-two appraisals with invoice dates between March 11, 2010 and October 3, 2011.  Out of those thirty-two, the debtors argue that Bank of America may be responsible for the costs of approximately twenty-three of those appraisals, depending on the outcome of the Adversary Proceeding.  <u>See</u> Debtors' Exhibit 5, Hearing on Objections to Claims, December 12, 2012.

_____

[9]The Construction Loan Agreement uses the term "Event of Default" instead of the term "Default" as used in the Acquisition and Site Work Improvement Loan Agreement.

[10]The Construction Loan Agreement omits the word "extension" in its provision addressing the costs of appraisals.

[11]The Construction Loan Agreement omits the entire sentence, "Such cost shall be due and payable by Borrower on demand and shall be secured by the Loan Documents."

16

While the ultimate outcome of this particular objection depends on the resolution of the Adversary Proceeding, the court is able to set out in this order certain determinations with respect to the costs of appraisals.  Regarding the notes associated with the Construction Loan Agreement, if there is determined to have been an "Event of Default," then the debtors that executed those notes will be responsible for the costs of all appraisals occurring after the "Event of Default."  If there was no "Event of Default," then those debtors will be responsible for only the first appraisal within any three-year period, unless the particular appraisal was obtained "in connection with an amendment, modification, supplement to or restatement of this Agreement or any Loan Document" in which case the debtors would be responsible for the costs of that appraisal as well.

Regarding the notes associated with the Acquisition and Site Work Improvement Loan Agreement, if there is determined to have been a "Default," then the debtors that executed those notes will be responsible for the costs of all appraisals occurring after the "Default."  If there was no "Default," then those debtors will be responsible for only the first appraisal within any three-year period, unless the particular appraisal was obtained "in connection with an extension, amendment, modification, supplement to or restate of this Agreement or any Loan Document" in which case the debtors would be responsible for the costs of that appraisal as well.

The debtors submitted an Exhibit 5 at the hearing which indicated that the total cost of the appraisals ordered by Bank of America is $123,440.  The Exhibit also indicates that the cost of appraisals for which the debtors are responsible if there were no Defaults or Events of Default is $54,490.  Bank of America did not dispute the accuracy of the Exhibit and the court therefore adopts

those amounts as the appropriate appraisal cost component of Bank of America's claims, dependent upon the determination of the existence and timing of default in the Adversary Proceeding.

**SO ORDERED**.

**END OF DOCUMENT**